STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; NANTA-
HALA POWER & LIGHT COMPANY, APPLICANT; TAPOCO, INC. AND
ALUMINUM COMPANY OF AMERICA, RESPONDENTS v. RUFUS L. ED-
MISTEN, ATTORNEY GENERAL; PUBLIC STAFF—NORTH CAROLINA
UTILITIES COMMISSION; COUNTIES OF CHEROKEE, GRAHAM, JACK-
SON, MACON, AND SWAIN; TOWNS OF ANDREWS, BRYSON CITY,
DILLSBORO, ROBBINSVILLE, AND SYLVA; TRIBAL COUNCIL OF THE
EASTERN BAND OF CHEROKEE INDIANS; HENRY J. TRUETT, HOW-
ARD PATTON, VERONICA NICHOLAS, O. W. HOOPER, JR., ALVIN E.
SMITH, LARRY LYNN BAILEY; AND JACKSON PAPER MANUFACTUR-
ING COMPANY, INTERVENORS

No. 549A84

(Filed 13 August 1985)

1. **Electricity § 3; Utilities Commission § 36— electric rates—"stand alone" basis for Nantahala—insufficient consideration of "roll-in" evidence—insufficient findings**

The Utilities Commission erred in its order establishing Nantahala's retail rates on a "stand-alone" basis after a "roll-in" methodology had been utilized by the Commission and affirmed by the Supreme Court in two preceding general rate cases involving Nantahala, Tapoco and Alcoa by failing to accord more than minimal consideration to competent evidence suggesting the continued propriety of utilizing the "roll-in" methodology, and by failing to find facts with respect to the issues of whether Tapoco and Alcoa remain North Carolina public utilities, whether the properties of Nantahala and Tapoco constitute a unified single electric system despite new contractual arrangements between Nantahala and TVA and between Tapoco and TVA, and whether Alcoa still so dominates Nantahala as to require piercing of the corporate veil between them.

2. **Electricity § 3; Utilities Commission § 36— electric rates of Nantahala—indirect benefits to Alcoa from new agreements**

In evaluating the effect on Nantahala's costs of service of new "stand-alone" agreements between Nantahala and TVA and Tapoco and TVA, the Utilities Commission must address in a direct and final manner the issue of indirect benefits to Alcoa resulting from the exclusion of Nantahala from the 1983 Tapoco-TVA Exchange Agreement, and whether a roll-in will "cancel" or "true-up" any such indirect benefits as may be found to enure to Alcoa from this changed circumstance.

3. **Electricity § 3; Utilities Commission § 36— future rates of Nantahala—requiring financial support by Alcoa**

If the Utilities Commission again finds that Alcoa is a North Carolina public utility pursuant to G.S. 62-3(23)c, it may require Alcoa, as a public utility, to protect its subsidiary Nantahala financially as to future rates in much the same way as it has been held responsible for past locked-in rates.

**4. Electricity § 3; Utilities Commission § 36— rolled-in rates of Nantahala—requiring periodic payments by Alcoa**

Nantahala can be protected from any financial hardship that the Utilities Commission may determine to result from rolled-in future rates by requiring Alcoa to pay periodically (monthly) to Nantahala any revenue shortfall which appears in Nantahala's accounting data as a result of Alcoa's decision to maintain separate corporate entities for Nantahala and Tapoco.

**5. Electricity § 3; Utilities Commission § 43— electric rates—refusal to establish new rate class—no unlawful discrimination**

In a proceeding to establish the retail rates for Nantahala Power Company, the evidence supported the Utilities Commission's refusal to establish a new Large Industrial Service rate class which would apply only to Jackson Paper Manufacturing Company because such a rate class was not cost justified and would result in a revenue requirement deficit that would have to be made up by other rate classes. Nor did the Utilities Commission unlawfully discriminate against Jackson Paper Manufacturing Company in violation of G.S. 62-140 by its failure to establish a separate Large Industrial Service rate for its service.

APPEAL by intervenors pursuant to N.C.G.S. § 7A-29(b) from the final order of the North Carolina Utilities Commission entered 12 April 1984 in Docket No. E-13, Sub 44. Heard in the Supreme Court 11 March 1985.

This matter was initiated by Nantahala Power and Light Company ("Nantahala") on 1 February 1983 by the filing of an application with the North Carolina Utilities Commission (the "Commission") to adjust its rates so as to increase charges to its North Carolina retail customers by $1,443,000 and to revise its Purchased Power Cost Adjustment clause ("PPCA") applicable to all retail electric rates.

In its latest application for a rate increase, Nantahala alleged that it should no longer be subject to the rate levels based on the roll-in performed in its last preceding rate case (Docket No. E-13, Sub 35) because its investments and expenses relative to its North Carolina retail rates had been "drastically altered" due to a new power supply agreement entered into between Nantahala and the Tennessee Valley Authority ("TVA"), effective 1 January 1983. The new contract was apparently intended to replace, insofar as Nantahala was concerned, the 1962 New Fontana Agreement ("NFA") between TVA, Alcoa, Nantahala, and Tapoco and the 1971 Nantahala-Tapoco Apportionment Agreement (the "1971 Apportionment Agreement") which expired by their respective

terms on 31 December 1982. Inequities under these expiring contracts, according to Nantahala, had formed the basis of the Commission's prior decisions to implement a roll-in of the properties, investments, and revenues of Nantahala and Tapoco and therefore their expiration and replacement with a new TVA-Nantahala supplemental power purchase agreement obviated the need for a roll-in to be performed in setting Nantahala's retail rates.

In addition to the foregoing "changed circumstance," Nantahala alleged that its present rates as established in Docket No. E-13, Sub 35, were unreasonably low and failed to provide a fair rate of return to the utility necessary to provide service and attract capital for construction and other capital projects. Finally, Nantahala stated that an immediate rate increase was imperative in the face of Alcoa's intention to file an application with the Commission[1] to sell all of its stock in Nantahala, "fully evidencing its desire and intent to divorce itself completely from any interest in Nantahala other than as a holder of certain subordinated debt," so that Nantahala could establish a record of financial stability and obtain long-term debt and equity financing to meet the demands of its customers and undertake new construction. The historical test year data submitted by Nantahala in the Sub 44 proceeding is for the twelve-month period ending 31 December 1981; evidence of its new power supply agreement with TVA, executed on 22 December 1982, was alleged by Nantahala to be admissible under N.C.G.S. § 62-133(c), which allows public utilities to file for Commission consideration such relevant, material, and competent evidence showing actual changes in costs, revenues, or the value of property "based upon circumstances and events occurring up to the time the hearing is closed."

The matter was treated as an application for a general rate increase under N.C.G.S. § 62-137; and various parties, including the Attorney General of North Carolina and the Public Staff of the North Carolina Utilities Commission, on behalf of the using and consuming public, and certain individual rate payers, were permitted to intervene in the proceedings. With the exception of intervenor Jackson Paper Manufacturing Company, all of the in-

---

1. The record indicates that Alcoa has indeed carried through with its intention to apply to sell its interest in Nantahala to Nantahala's employees under an Employee Stock Option Plan filed in Docket No. E-13, Sub 51.

tervening parties (the "intervenors") moved to dismiss Nantahala's application on the basis of determinations contained in prior Commission Docket Nos. E-13, Sub 29 (Remanded) and Sub 35, in which a "roll-in" methodology of rate making was implemented, because the 1983 filing did not include Nantahala's parent, Aluminum Company of America ("Alcoa") and its affiliate, Tapoco, Inc. ("Tapoco") as parties and did not include financial data respecting Tapoco's rate base, expenses, and revenues. In the alternative, the intervenors moved to suspend the running of the 270-day hearing date period, defer the hearings, join Alcoa and Tapoco as parties, and requested consideration and implementation of the roll-in rate making methodology previously used by the Commission in setting Nantahala's intrastate retail rates. Jackson Paper Manufacturing Company's separate challenges to the proposed Nantahala rate increase do not concern the question of roll-in and will be treated separately herein.

Appeals by Nantahala, Alcoa, and Tapoco (the "companies") from the orders entered by the Commission in Docket Nos. E-13, Sub 29 (Remanded) and Sub 35, were pending at the time Nantahala initiated this third rate increase proceeding in a seven-year period. The Commission's orders in Sub 29 and Sub 35 have subsequently been affirmed by this Court in *Utilities Commission v. Nantahala Power and Light Co.*, 313 N.C. 614, 332 S.E. 2d 397 (1985), and *Utilities Commission v. Nantahala Power and Light Co.*, 314 N.C. 246, 333 S.E. 2d 217 (1985). The essence of these prior orders was the Commission's determination that the hydro-electric facilities and properties of Nantahala and Tapoco constitute a single, unified electric system and should be treated as such, or "rolled-in," for retail rate making purposes, and its further determination that the single system's corporate parent, Alcoa, should be held financially responsible for excessive rates collected by Nantahala under the "stand-alone" rate making model previously used by the utility in computing Nantahala's retail costs of service and revenue requirements.

Following a hearing on the intervenors' motion to dismiss, the Commission issued an order on 22 April 1983 denying the motions to dismiss or delay the hearings on Nantahala's rate increase request. In addition, the Commission deferred its ruling on

the motions to join Alcoa and Tapoco as parties, and made the following conclusions concerning the intervenors' motions to dismiss:

> The Commission further concludes that the Supreme Court's decision in *Utilities Commission v. Edmisten, Attorney General*, 299 N.C. 432 (1980) is not the law in this case. The *Edmisten* case remanded Docket E-13, Sub 29, to consider whether it should adopt a roll-in rate-making device to "true-up" alleged rate-making benefits flowing to Alcoa from Nantahala by virtue of the Fontana and Apportionment Agreements. Since the Fontana Agreement expired on December 31, 1982, and has been replaced by a new power supply arrangement between Nantahala and TVA, it would not be appropriate at this time to consider a roll-in device in this docket until that issue is properly raised through evidence at the hearing.

However, the Commission took "judicial" notice of its past orders regarding the relationship between Alcoa and its subsidiaries Nantahala and Tapoco and concluded that the terms and conditions of the new power supply agreement between Nantahala and TVA should be fully explored at the hearing to determine whether Nantahala's customers are fairly treated under the new arrangements with TVA. Accordingly, the Commission directed Nantahala to supply certain data applicable to the roll-in issue, including its new power supply agreement with TVA, to the Commission and further directed Tapoco to "assist and cooperate with Nantahala" in providing this data.

The intervenors subsequently filed motions seeking judicial notice and application of the doctrine of res judicata to certain facts established in Docket Nos. E-13, Sub 29 (Remanded) and Sub 35 regarding the public utility status of Tapoco and Alcoa, the propriety of a roll-in rate making methodology for Nantahala and Tapoco and the liability of Alcoa for the financial obligations of its public utility subsidiary Nantahala. In an order entered 9 August 1983, the Commission directed that Alcoa and Tapoco be joined as parties so that the applicant and the intervenors might have the fullest opportunity to explore the issues raised by the rate increase request. However, the Commission denied the intervenors' motion requesting judicial notice and the application of the doc-

trine of res judicata to the relevant factual findings contained in the Commission's previous orders. Rather, the Commission concluded that "these facts should be a matter of proof at the hearing in this case." In addition, the Commission agreed to take judicial notice of any relevant orders in Docket Nos. E-13, Sub 29 (Remanded) and Sub 35, if so requested by any party at the hearing.

Thereafter, hearings were held before a panel of the Commission in late September and early October 1983. The intervenors' renewed motion for judicial notice and application of the doctrine of res judicata to the requested factual determinations was also denied and all parties were permitted to present evidence on these and other relevant issues. On 29 November 1983, the Commission panel issued a "Notice of Decision and Order" and on 22 December 1983, issued an "Order Granting Partial Rate Increase," establishing Nantahala's rates on a "stand-alone" basis and approving virtually all of the rate increases proposed by the company. The rate schedules approved by the Commission panel reflected an increase of $1,335,857 in base rates and authorized a base unit cost of approximately 1.13 cents per kWh for purchased power, excluding gross receipts tax.

By its rate orders, the Commission: (1) adjusted the test year (1981) data to account for certain circumstances and events up to the time of the close of the hearing in October 1983 including recognition of the two new power supply agreements with TVA on the one hand and Alcoa, Tapoco, and TVA on the other, and which became effective on 1 January 1983; (2) found that no direct benefits now accrue to Alcoa as a result of the 1983 Nantahala-TVA Interconnection Agreement and the 1983 Tapoco-TVA Exchange Agreement (the "Fontana III Agreements") and that if any indirect benefits flow to Alcoa thereunder, these indirect benefits do not appear to be the result of any unlawful preference having been shown to Alcoa by Nantahala; (3) found that rolled-in rates would result in insolvency or bankruptcy for Nantahala absent (a) an accompanying order from the appropriate federal jurisdiction requiring the physical sale of Tapoco power to Nantahala, or (b) a guarantee of Nantahala's financial integrity by Alcoa; (4) found that the Nantahala electric system should be treated independently of Tapoco; (5) failed or declined to find that either Alcoa or Tapoco were North Carolina public utilities; (6)

failed or declined to find that Nantahala's and Tapoco's properties form a single, unified electric public utility system; and (7) failed or declined to find that Alcoa so dominates Nantahala as to warrant piercing the corporate veil between them and holding Alcoa responsible for Nantahala's financial obligations. In addition, the Commission declined to approve the proposed rate schedule, LIS (Large Industrial Service), which Jackson Paper Manufacturing Company had requested.

Thereafter, the intervenors filed a motion that issuance of the final order be held in abeyance pending the final adjudication of the matters raised in (1) Docket No. E-13, Sub 51, in which Alcoa proposes to sell its stock interest in Nantahala to a group of Nantahala's salaried employees using a leveraged ESOP buyout, and (2) the consolidated cases pending before the Federal Energy Regulatory Commission ("FERC") (Docket Nos. ER82-774-000, et al.), in which the companies are seeking permission to terminate the NFA and 1971 Apportionment Agreement and place into effect the Fontana III Agreements and in which the majority of the present intervenors, including the Commission itself, are seeking an order from the FERC allocating or requiring the sale of Tapoco power and energy to Nantahala. This motion was denied upon issuance of the final order in the Sub 44 proceeding.

The Full Commission, upon the intervenors' appeal, issued its final order on 12 April 1984 affirming the panel order granting the increase in rates and denying the intervenors' exceptions and motions for reconsideration. Two Commissioners dissented from the Full Commission's order, for the principal reasons that: (1) the Nantahala-Tapoco properties continue to form a single electric system; (2) Alcoa continues to dominate Nantahala and the veil of corporate separateness between them should be pierced; (3) Nantahala's rate payers have been and are being systematically deprived of the less expensive power produced by the "Alcoa System's" hydroelectric facilities; (4) the potential bankruptcy of Nantahala is not a real threat, but rather is a fiction propagated by Alcoa; (5) the new power supply agreements with TVA are an improper mechanism for the allocation of power costs among the system's members or users; (6) the roll-in rate making technique remains appropriate in the case of Nantahala and Tapoco; and (7)

the Full Commission has underestimated its regulatory authority over Alcoa with respect to Nantahala's rates and service.

All of the intervenors filed timely exceptions and appealed from the final order of the Commission granting Nantahala a partial rate increase based upon a stand-alone rate making technique. Jackson Paper's exceptions and appeal concern the Commission's failure to approve the Large Industrial Service rate schedule proposed by that company, while the other intervenors' exceptions and appeal primarily concern the question of "roll-in" and Alcoa's continued liability for the financial integrity and obligations of its subsidiary Nantahala.

*Lacy H. Thornburg, Attorney General, by Richard L. Griffin, Assistant Attorney General, for Using and Consuming Public.*

*Robert Gruber, Executive Director, by James D. Little, Staff Attorney, The Public Staff, for the Using and Consuming Public.*

*Crisp, Davis, Schwentker & Page, by Robert F. Page, for intervenor-appellants Counties of Cherokee, Graham, Jackson, Macon, and Swain; Towns of Andrews, Bryson City, Dillsboro, Robbinsville, and Sylva; Tribal Council of the Eastern Band of Cherokee Indians; and Henry J. Truett, Howard Patton, Veronica Nichols, O. W. Hooper, Jr., and Alvin E. Smith.*

*Hatch, Little, Bunn, Jones, Few and Berry, by David H. Permar, for intervenor-appellant Jackson Paper Manufacturing Company.*

*Hunton & Williams, by Edward S. Finley, Jr., for respondent-appellee Nantahala Power and Light Company.*

*LeBoeuf, Lamb, Leiby & MacRae, by Ronald D. Jones, David R. Poe, and Dennis P. Harkawik, of Counsel, for respondent-appellees Aluminum Company of America and Tapoco, Inc.*

MEYER, Justice.

[1] The principal question raised by this appeal is whether the Commission erred as a matter of law in its order establishing Nantahala's retail rates on a "stand-alone" basis by failing to accord more than minimal consideration to competent evidence suggesting the continued propriety of utilizing the "roll-in" rate making methodology applied by the Commission in two preceding

general rate cases involving Nantahala, Tapoco, and Alcoa and affirmed by this Court in *Utility Commission v. Nantahala Power and Light Co.,* 313 N.C. 614, 332 S.E. 2d 397 ("*Nantahala I*"), and *Utilities Commission v. Nantahala Power and Light Co.,* 314 N.C. 246, 333 S.E. 2d 217 ("*Nantahala II*"). In this appeal, the intervenors contend that the four basic factual determinations which supported the 1981 Docket No. E-13, Sub 29 (Remanded) order implementing roll-in, affirmed in *Nantahala I,* and the 1982 Docket No. E-13, Sub 35, order implementing a roll-in, affirmed in *Nantahala II,* continue to be present and relevant to the fundamental question as to what is the just and reasonable level of rates for Nantahala to charge its retail customers under Chapter 62 of the North Carolina General Statutes.

These four basic factual issues or determinations raised by the intervenors in pre-hearing motion and through the presentation of evidence during the 1983 adjudicatory hearings, as stated in the pre-hearing motion, are as follows:

1. Tapoco, Inc., is a North Carolina electric public utility;

2. Aluminum Company of America (Alcoa) is a North Carolina electric public utility;

3. The properties of Nantahala and Tapoco constitute a unified single electric system;

4. Alcoa so dominates Nantahala as to pierce the veil of corporate separateness between them.

The intervenors challenge the Commission's order granting Nantahala a partial rate increase on a number of grounds. The intervenors contend, *inter alia,* that the Commission's findings and conclusions prejudice their substantial rights by: (1) the Commission's failure to accord more than minimal consideration to the evidence respecting the four issues raised by both pre-hearing motion and testimony at the rate hearings as shown by the lack of findings of fact on these issues; (2) the Commission's erroneous decision to treat Nantahala as a stand-alone company for rate making purposes; and (3) the Commission's error in determining that it could not set Nantahala's rates on a rolled-in basis absent a voluntary commitment on the part of Alcoa to support Nantahala financially should any revenue short-fall occur under a roll-

in. For the reasons set forth below, we reverse the final order of the Commission in Docket No. E-13, Sub 44, and remand the matter to the Commission for further proceedings in light of our recent decisions in *Nantahala I* and *Nantahala II*, and consistent with the opinion rendered herein.

We will review, in the following order: (1) the prior regulatory and judicial decisions involving the propriety of a roll-in rate making methodology for setting Nantahala's retail rates; (2) the evidence presented in the Sub 44 hearing with respect to the issues raised by Nantahala's rate increase request; (3) the Commission's consideration, or failure of consideration, of the four issues raised by the intervenors by pre-hearing motion and evidence presented at the hearings; (4) the Commission's decision to set Nantahala's rates on a stand-alone basis; (5) the Commission's determination that it lacked authority to require Alcoa to support Nantahala financially under a roll-in order; and (6) the Commission's failure to approve the "LIS" rate requested by Jackson Paper Manufacturing Company.

I.

This appeal is the fourth in a sequence that originated in 1976 with the filing of a rate increase application by Nantahala in Docket No. E-13, Sub 29.[2] In that general rate case, a number of the present intervening parties and rate payers brought to the attention of the Commission four issues which they argued would support the implementation of a roll-in of the properties and financial data of Nantahala and Tapoco for rate making purposes. Those issues concerned the public utility status of Alcoa and Tapoco under North Carolina law, the existence of a single, unified Nantahala-Tapoco hydroelectric utility system in western North Carolina, and the domination and manipulation of that single utility system by the common corporate parent, Alcoa, for its benefit to the significant detriment of the using and consuming public. In its 14 June 1977 order approving Nantahala's rate increase request, the Commission failed to consider these issues and established Nantahala's intrastate retail rates on a stand-alone basis, pursuant to and in recognition of costs incurred by

2. Where necessary to supplement this review we have taken judicial notice of our records in *Nantahala I* and *Nantahala II*. See *Bizzell v. Ins. Co.*, 248 N.C. 294, 103 S.E. 2d 348 (1958).

Nantahala under the terms of power supply agreements then in effect between and among Nantahala, Tapoco, Alcoa, and TVA. The two principal power supply agreements at issue were the 1962 New Fontana Agreement between Alcoa, Nantahala, Tapoco, and TVA and the 1971 Apportionment Agreement between Nantahala and Tapoco.

In *Utilities Commission v. Edmisten*, 299 N.C. 432, 263 S.E. 2d 583 (1980) ("*Edmisten*"), we reviewed the Sub 29 order and determined that the Commission's summary disposition of the intervenors' contentions regarding roll-in indicated that the Commission had accorded only minimal consideration to competent evidence, and further held that such a treatment constitutes error of law correctable on appeal. *Id.* at 437, 263 S.E. 2d at 588; N.C.G.S. § 62-94(b)(4). *See also Utilities Commission v. Gas Co.*, 254 N.C. 536, 119 S.E. 2d 469 (1961). Specifically, the order was reversed on the grounds that it was not sufficient for the Commission to consider only the specific indicia of a utility's economic status set out in N.C.G.S. § 62-133(b), but that the Commission must also consider "all other material facts of record which may have a significant bearing on the determination of reasonable and just rates" under N.C.G.S. § 62-133(d). 299 N.C. at 437, 263 S.E. 2d at 588. Accordingly, the matter was remanded with instructions to consider the evidence suggesting the propriety of the roll-in device; to obtain and consider information and data showing what Nantahala's cost of service to its customers would be if the roll-in rate making methodology were used; and to determine whether Nantahala's customers would benefit thereby.

Upon remand, the Commission focused on the four basic issues outlined above and (1) determined that Alcoa is a North Carolina public utility pursuant to N.C.G.S. § 62-3(23)c; (2) determined that Tapoco is a North Carolina public utility pursuant to N.C.G.S. §§ 62-3(23)a and (23)b and by virtue of its 1955 certificate of public convenience and necessity; (3) found that the Nantahala-Tapoco electric generation and distribution system constitutes a single, integrated electric system, designed, developed, and operated as such and coordinated as a single entity with the TVA system; (4) found that the use of an appropriately performed roll-in of Nantahala and Tapoco would be beneficial to Nantahala's customers because its allocated cost of power under the combined system is less than the cost of power for Nantahala treated as a

stand-alone system, such that roll-in will result in a significant reduction in the cost of providing public utility service to the single system's retail customers; (5) determined that significant detriments and inequities to Nantahala arise out of both the NFA and the 1971 Apportionment Agreement and that concealed benefits flowing to Alcoa through its subsidiary Tapoco render use of those contracts inappropriate for determining the costs fairly attributable to the combined system's North Carolina public load; (6) determined that the rolled-in cost allocation methods and procedures proposed by the intervenors, based upon the generational capabilities and needs of Nantahala, are proper for use in the allocation of demand and energy related costs and should be adopted for use in setting Nantahala's retail rates in the Sub 29 (Remanded) proceeding; and (7) found that Alcoa had so dominated Nantahala in certain contracts and transactions involving Nantahala, Tapoco, and others that Nantahala had been left, as of 1981, "but an empty shell, unable to act in its own self-interest, let alone in the interest of its public utility customers in North Carolina," so as to render Alcoa responsible for such portions of any refund obligation placed upon Nantahala as Nantahala itself is unable to make to its customers.

The roll-in methodology proposed by the intervenors in the Sub 29 (Remanded) proceedings was then adopted and implemented by the Commission, resulting in the lowering of Nantahala's retail rates and the imposition of a refund obligation upon Nantahala and Alcoa. As we noted in *Nantahala I*, 313 N.C. at 628, 332 S.E. 2d at 406, the roll-in method treats Nantahala and Tapoco as a single, integrated system for accounting purposes. That is, (a) the assets, properties, plants, and working capital requirements of the two companies are joined in one unified rate base; (b) the joint revenues and expenses of the single system are totalled; and (c) the combined system is assigned a rate of return. From these three elements, the combined system revenue requirement (expenses + rate base × rate of return) is derived. Next, the combined system cost of service is allocated between the public load customers in North Carolina and the industrial load customer (Alcoa) in Tennessee, using generally accepted jurisdictional allocation factors for setting the retail rates of public utilities operating in more than one state. Nantahala's retail rates under such a rate making methodology are lower than they would be un-

der a stand-alone computation because the cost of service per kilowatt-hour for the unified Nantahala-Tapoco system is lower than for Nantahala treated as a stand-alone electric system.

In *Nantahala I*, we noted that "[t]he propriety of the separation or rolling-in of properties of affiliated corporations for rate making purposes, being merely a step in the determination of costs properly allocable to the various classes of service rendered by a utility, is widely recognized as dependent upon the particular characteristics of the system or systems in question, and upon the facts and circumstances of each case." 313 N.C. at 644-45, 332 S.E. 2d at 416. In addition, we observed that "the question of whether to treat various entities as an integrated system for rate making purposes is not a purely factual question, but also rests on criteria which each rate making authority may deem relevant." *Id.* at 645, 332 S.E. 2d at 416 (*quoting Nantahala Power and Light Co.*, Opinion No. 139-A, 20 F.E.R.C. ¶ 61,430, p. 61,869 (1982)). After undertaking an exhaustive review of the design, development, and operation of the various corporate entities which have from time to time comprised the comprehensive Alcoa power system in western North Carolina during the twentieth century, we categorically affirmed the Commission's factual determinations regarding the public utility status of Alcoa and Tapoco, the existence of a single, unified Nantahala-Tapoco electric utility system, the historical domination of that single system by the common corporate parent Alcoa, and the Commission's decision to utilize the roll-in rate making methodology proposed by the intervenors. 313 N.C. at 644-84, 332 S.E. 2d at 416-38. Specifically, we held:

> In summary, the evidence of record gathered at the remanded hearings before the Commission in this general rate case establishes beyond question three basic propositions: (1) Tapoco is a North Carolina public utility; (2) the hydroelectric facilities of Nantahala and Tapoco constitute a unified, single system, operating under conditions rendering a roll-in rate making methodology appropriate; and (3) Alcoa is a statutory North Carolina public utility to the extent that its affiliation with Nantahala has affected Nantahala's rates.

*Id.* at 666, 332 S.E. 2d at 428.

Later, in addressing the respondent companies' arguments against the roll-in order arising under federal law, we described the legal and factual bases of the Sub 29 (Remanded) order:

> In this case, the Commission, in carrying out its duty to determine what are reasonable and just rates for Nantahala's intrastate retail customers to pay for electric service, made a searching examination of "all material facts of record," as it is required to do by N.C.G.S. § 62-133(d), including but not limited to, the effect of the FERC-filed power supply contracts on Nantahala's costs of service. It also considered the entire historical development of the Nantahala-Tapoco electric system and the intercorporate allocation of the costs and benefits associated therewith.

> The Commission's extensive and detailed findings of fact taken as a whole effectively demonstrate that certain portions of the operating expenses Nantahala incurs under the NFA and 1971 Apportionment Agreement were not incurred for the benefit of Nantahala's retail rate payers, were not required for their service and were not offset by compensating economies or benefits in other areas of the utility's operations. In addition, the Commission determined that Nantahala's parent Alcoa, which is also the single largest customer of the combined system, had so dominated Nantahala that the utility was unable to act either in its own self-interest or in the interests of its public customers and that through its domination, Alcoa had received substantial concealed benefits, by means of the contractual and intercorporate structure of the "Alcoa power system," to the corresponding detriment of Nantahala's ability to render service at reasonable and just rates to its public customers. . . .

> . . . .

> . . . In effect, the Commission has recognized that two affiliated North Carolina public utilities, Nantahala and Tapoco, both of whom are controlled by their parent-customer Alcoa, itself a North Carolina statutory public utility, were in substance providing a joint service to retail customers in North Carolina, as well as to Alcoa, although the public service in North Carolina was labeled as service from Nantahala alone. By means of the roll-in, the Commission set

the "Nantahala" retail rates by combining the financial data of the two affiliates into a unified rate base, and determined on a conventional load responsibility basis what portion of the rolled-in system's costs should be borne by the non-Alcoa customers, to produce the same billing rates as would result from an explicitly joint service at lawful, nondiscriminatory rates. Thus, it disregarded only the fiction of Tapoco as a separate utility system serving only Alcoa, in order to ensure that the joint Nantahala-Tapoco service to North Carolina retail customers was provided at just and reasonable rates. Insofar as the Commission determined that Alcoa as corporate parent and private industrial customer had benefited at the expense of the public load from the corporate and power supply arrangements it imposed upon its subsidiaries, it was well within its regulatory authority to decide that the costs associated with those benefits would not be borne by the public consumers in the form of higher retail rates, but would be borne by the company's customer and sole shareholder, Alcoa.

In practice, the Commission's roll-in methodology accepted Nantahala's and Tapoco's entitlements under the NFA and 1971 Apportionment Agreement, and Nantahala's supplementary purchases from TVA, as elements of the combined Nantahala-Tapoco cost of service. The Commission then determined that it was inappropriate to allow Nantahala to collect all of its revenue requirements from its public customers on the theory that it was a stand-alone company, because Nantahala's "stand-alone" costs under the corporate and contractual arrangements were not incurred for their benefit, but as a result of Alcoa's corporate dominance for Alcoa's benefit.

313 N.C. at 700-02, 332 S.E. 2d at 448-49.

As to the evidence supporting the imposition of financial responsibility upon Alcoa for Nantahala's refund obligation, we stated:

The entire historical pattern of Nantahala's development is replete with instances of the manner in which Alcoa dominated the development, sale and operation of Nantahala's hydroelectric resources and facilities, and subordi-

nated these resources to what Alcoa considered to be the paramount needs of its aluminum smelting and fabrication operations in Alcoa, Tennessee. For example, Nantahala added generating capacity, vastly in excess of the amounts required to service its public load, for the express purpose of meeting Alcoa's expanding production needs prior to and during the war years at mid-century. Yet, in the last thirty years, Alcoa has caused Nantahala to remain inert in terms of obtaining additional capacity, either through development of additional generating facilities or through long-term purchase power agreements with others tailored to Nantahala's particular needs, as Alcoa's electricity requirements have leveled off, despite substantial constant growth in Nantahala's public load. As we observed earlier, Alcoa's unified development of the hydroelectric resources of its public utility subsidiaries was undertaken in the paramount interest of obtaining low-cost hydroelectric power for itself.

313 N.C. at 730, 332 S.E. 2d at 465.

On 31 December 1980, during the pendency of the Sub 29 (Remanded) proceeding, but prior to the hearings and determination of the matter by the Commission, Nantahala filed an application in Docket No. E-13, Sub 35, seeking to increase its rates and charges for retail electric service in North Carolina effective 1 February 1981. As it had in the preceding Sub 29 application, Nantahala again failed to include data concerning its costs of service under a roll-in methodology in the Sub 35 application. The proposed increase in rates and charges was designed to produce approximately $2,147,853 of additional revenues for Nantahala's North Carolina retail operations based upon the level of operations in the test year 1979.

On 16 January 1981, the Public Staff and the Attorney General moved to dismiss the application, or, in the alternative, to defer hearing the case and to join Alcoa and Tapoco as parties to the proceeding. The intervenors argued that Nantahala's application was deficient for failure to include roll-in data, which, in the view of the moving parties, was required by our decision in *Edmisten.* The Commission, on 13 March 1981, issued an order denying the motions to dismiss or join additional parties, but requiring Nantahala to submit data and testimony in the Sub 35 docket on

the issue of utilizing a rolled-in cost of service treating Nantahala and Tapoco as a single system for rate making purposes. In that order, the Commission reasoned that a roll-in determination was required in Docket No. E-13, Sub 35, "independently and irrespective" of whether such a determination was as required in Docket No. E-13, Sub 29. The Commission observed that two different test years were at issue in the Sub 29 and Sub 35 dockets and that the earlier case had involved a rate base determined on fair value, whereas the Sub 35 case involved a rate base to be determined on original cost, and concluded that "the factual and legal framework of the two cases is such that a roll-in determination in the remanded case is not necessarily dispositive of whether a roll-in determination is required in the current case." Accordingly, the Commission treated the roll-in determination as a question of fact to be determined anew in the Sub 35 docket and ordered the appropriate data to be submitted. Alcoa and Tapoco were eventually ordered joined as parties to the proceeding, and on 8 June 1982 the Commission issued an order implementing a roll-in rate making methodology for Nantahala and Tapoco for the second time in a nine-month period.

All of the relevant power supply contracts and operating conditions at issue in the Sub 29 (Remanded) case, as well as all pertinent intercorporate structures between Nantahala, Tapoco, and Alcoa, had remained unchanged during the pendency of the Sub 35 proceedings. Accordingly, the Commission made essentially identical findings of fact with respect to the key factual issues undergirding the roll-in rate making methodology and Alcoa's liability for Nantahala's financial integrity. On the latter issue, however, the Commission's Sub 35 order contains a discussion of the new or additional evidence presented during the September 1981 and February and March 1982 hearings, which has some relevance to the arguments presented by the intervenors in the Sub 44 proceeding as to Alcoa's continued domination of Nantahala. These portions are as follows:

> *Alcoa's dominance over Nantahala is obviously and frequently documented in the results of various arrangements it has caused Nantahala and Tapoco to enter into. Such dominance has caused detriment to Nantahala and has resulted in the passing of concealed benefits to Alcoa. Other indications of dominance of Nantahala by Alcoa are* that its facilities are

integrated and interconnected into Tapoco's so as to form a single system; the majority of Nantahala's Directors are employees of Alcoa; and Alcoa Vice President has the proxy for selecting the board membership; under the President's new employment contract he receives incentive awards at the instance of a committee of directors, which committee would include only Alcoa employees since the other directors are subordinate to the president and would be excluded; *the decision to negotiate alone with TVA for a new agreement to replace the expiring New Fontana Agreement was forced upon Nantahala by the Alcoa-Tapoco decision to exclude Nantahala's interest from its negotiations with TVA*; and Alcoa controls accounting policies.

Alcoa's dominance over Tapoco is more blatant than its dominance over Nantahala. Tapoco's headquarters are at Alcoa, Tennessee; its president is a salaried employee of Alcoa serving Alcoa as its Alcoa, Tennessee, power supply manager; its vice presidents are Alcoa employees; it serves only its owner; it sells all of its NFA entitlements to Alcoa for a nominal 4½% profit; each corporate director is an Alcoa employee; Alcoa provides all Tapoco financing; and Alcoa controls the ultimate operation and accounting policies even to the extent of physically keeping Tapoco's financial records and books at Alcoa's Pittsburgh headquarters. (Emphasis added.)

Once again, on the basis of Alcoa's domination over its wholly owned public utility subsidiaries, Nantahala and Tapoco, the Commission imposed a refund obligation on Alcoa for any refunds which Nantahala was unable to make to its customers as a result of the Commission's order. The order of the Commission in Docket No. E-13, Sub 35, was affirmed by this Court in all material respects in *Utilities Commission v. Nantahala Power and Light Co.*, 314 N.C. 246, 333 S.E. 2d 217.

## II.

As indicated by the Commission in the above-quoted portion of its order, negotiations to replace the NFA and 1971 Apportionment Agreement, both to expire by their respective terms on 31 December 1982, were underway at the time the Sub 35 rate increase request was pending before the Commission. Upon execu-

tion of the 1983 Fontana III Agreements between TVA and Nantahala, on the one hand, and TVA and Tapoco, on the other, Nantahala instituted its third rate increase request since 1976 in this, the Sub 44 proceeding.

Nantahala's application in Docket No. E-13, Sub 44, lacked roll-in data as had its two preceding applications. Eventually, the Commission ordered that such data be submitted and that Alcoa and Tapoco be joined as parties to the proceedings, denied the intervenors' pre-hearing motions designed to obviate the need to relitigate the four roll-in related issues adverted to earlier, and proceeded to hear witness testimony and received exhibits from all parties. Although the NFA and 1971 Apportionment Agreements were still in effect during the test year 1981, the focus of the Sub 44 hearings was on the effect of the 1983 Nantahala-TVA Interconnection Agreement ("1983 Interconnection Agreement") upon Nantahala's prospective costs of service pursuant to N.C.G.S. § 62-133(c).

At the hearings, the intervenors urged the Commission to continue to establish Nantahala's rates through application of the roll-in rate making technique in the Sub 44 proceeding. The intervenors maintained that the new contractual arrangements between Nantahala and TVA, and between Tapoco and TVA, merely constitute a continuation of the same pattern that existed in the past. Nantahala and Alcoa, on the other hand, argued that the basis for the roll-in applied in Docket Nos. E-13, Sub 29 (Remanded) and Sub 35, no longer exists and that under the 1983 Interconnection Agreement, the inequities of the NFA and 1971 Apportionment Agreement have disappeared.

In fact, the principal, if not the only, evidence of "changed circumstances" with regard to Nantahala, Tapoco, and Alcoa presented by the companies was the new power supply contract between Nantahala and TVA, certain testimony and exhibits from the parties negotiating that agreement, and the new Tapoco-TVA agreement. The evidence, taken as a whole, tends to show that the coordination and exchange arrangements between the Alcoa system and TVA, which were the subject of extensive discussion by both the Commission and this Court in *Nantahala I*, are essentially intended to continue, with some modifications, under the new agreement which took effect 1 January 1983 between TVA,

on the one hand, and Tapoco on behalf of the Alcoa system, on the other. This contract, the 1983 Tapoco-TVA Exchange Agreement ("1983 Exchange Agreement") is significant in this case by virtue of the fact that Nantahala's generating plants, which had been subject to the OFA and NFA, are excluded from its coordination and exchange arrangements. For the first time in over forty years, Nantahala is permitted to use its plants exclusively to serve its public load. The only Alcoa system plants subject to TVA control are Tapoco's four generating plants, including its North Carolina facilities at Santeetlah and Cheoah.

However, the 1983 Exchange Agreement is very similar to the preceding Fontana agreements between TVA and the Alcoa system in that Tapoco and TVA continue to exchange power with one another. Under its terms, the hydroelectric generation resources of Tapoco are turned over to TVA to be operated in the TVA system against the total TVA system load. In return, TVA delivers to Tapoco 185 MW of continuous (100%) load factor power, which Tapoco turns over directly to Alcoa. The amount of power returned is to match the output from Tapoco's plants over the total lifetime of the contract, which is expected to run for at least twenty years. In that respect, Tapoco's power supply contract is somewhat similar to the former arrangement under the OFA where return power entitlements were set on the basis of system output, rather than fixed in advance as they were under the NFA. Under the 1983 Exchange Agreement, TVA is to make available to the Alcoa system a fixed amount of power regardless of streamflow for the first ten years, with that amount adjusted or "trued-up" over the remaining ten years in accordance with the actual output from the Tapoco plants. This feature protects the Alcoa system against wide swings in the availability of power depending upon water conditions. The agreement does not, however, reflect any direct credit for the Tapoco peaking capacity turned over to TVA in the arrangement because TVA expects to be "long on capacity" during the first ten years of the contract and was therefore unwilling to put any compensable value on the peaking capacity which it received.

Like Tapoco, Nantahala approached TVA seeking a twenty-year exchange type agreement wherein Nantahala would obtain a levelized return of power protecting it against fluctuations due to water conditions. What Nantahala ultimately obtained, however,

is a ten-year "interconnection" agreement by which Nantahala purchases supplemental power from TVA at such times as its customer demand outstrips its generational capacity. In essence, this is a continuation of an arrangement begun in 1971 when Nantahala's return entitlements under the NFA and 1971 Apportionment Agreement combined to artificially limit Nantahala's available power supply. At that time, Nantahala was constrained to enter into a supplemental purchase power agreement with TVA to meet its needs. The 1983 Interconnection Agreement, effective 1 January 1983, contemplates that Nantahala will dispatch its own generating plants, selling surplus power to TVA at such times as its production exceeds its customer demand, and purchasing supplemental power from TVA to meet generational deficits. The 1983 contract does give Nantahala almost full credit for its peaking capacity and nearly full credit for its actual generation.

Under the pricing structure of the 1983 Interconnection Agreement, Nantahala is to pay TVA a two-part rate to cover TVA's demand and energy costs. The capacity portion of the rate is priced at TVA's average system capacity cost with hydro removed. That is, Nantahala is charged on the basis of average TVA costs for all generation, including the higher cost base load coal and nuclear capacity, with the exclusion of the lower cost hydro generation. The second part of the rate, the energy portion, is priced on the basis of TVA's incremental costs, plus an additional amount (an "adder") which TVA deems necessary to assess. The incremental costs represent the next and more expensive generating unit(s) to be utilized to produce the necessary energy on an hourly basis, and it is not the rate at which TVA's other preference or highest priority customers (like Nantahala) are billed. These customers generally pay a lower average cost, which was also the basis upon which Nantahala's purchases were priced under the 1971 Nantahala-TVA purchase power agreement. As a result of this two-part rate structure, Nantahala will be purchasing energy that includes only the highest cost energy on the TVA system at any point in time, and very little of the base load coal fired and nuclear energy will flow to Nantahala. The intervenors' witness David A. Springs testified that this pricing concept is not cost-related and will be very disadvantageous to Nantahala in the

future as its public load continues to grow and this incrementally priced energy becomes more costly to produce, as is anticipated.

The greatest change under the Fontana III Agreements is that Nantahala, by no longer enjoying the exchange concept, will suffer severe fluctuations in costs depending on streamflow conditions. This is so because Nantahala's hydro resources are no longer turned over to TVA to be operated by TVA against the TVA load in return for the delivery of fixed entitlements based on average annual generation. In relatively dry years when streamflow is low, Nantahala will have to purchase more replacement energy from the TVA system. During such years, TVA's cost of power will be greater as well, inasmuch as both systems are in essentially the same geographical area and both serve similar loads. This situation is aggravated by the fact that the energy purchased from TVA is priced at the higher energy cost on the TVA system at that particular point in time. In dry years, when Nantahala's purchases are high, TVA's incremental cost will be higher than average or wet years simply because the TVA system will be operating more costly generation for more hours during the year to replace both its and Nantahala's unavailable hydro power. Of course, in wet years, Nantahala's purchases will be considerably less.

Two other apparent disadvantages of the 1983 Interconnection Agreement are that the contract is only for a ten-year period (extendable on a year-to-year basis), subject to cancellation on five years' notice, and that under the earlier Fontana agreements, Nantahala was entitled to receive power or compensation for the value which it provided as part of the interconnected TVA-Alcoa power system. The new agreements provide no such benefit even though Nantahala, by virtue of operational coincidence, remains essentially interconnected with TVA, since its upstream water storage and release tends to coincide with that of TVA. In summary, there is a possibility that the 1983 Interconnection Agreement will remain in effect for a relatively short period of time, leaving Nantahala and its customers vulnerable to uncertainties in supply and price in the relatively near future, and therefore more vulnerable to rate increases.

The 1983 Exchange Agreement and the 1983 Interconnection Agreement, unlike their predecessors, were negotiated separately

between each of the Alcoa system generating companies and TVA. Although Alcoa had negotiated the Original and New Fontana Agreements, which controlled Tapoco's and Nantahala's electrical production rights as a single unit for forty years, Alcoa declined to negotiate for or with Nantahala for a replacement agreement. Instead, as the Commission itself found in its Sub 35 order, Alcoa decided that Nantahala should negotiate independently of Tapoco, as if it were a stand-alone utility. On 6 June 1977, S. Alfred Jones, an Alcoa official, sent a letter to TVA official Albert O. Daniels in confirmation of an earlier (2 June 1977) discussion in Chattanooga, Tennessee, concerning renegotiation of the New Fontana Agreement and the Alcoa-TVA Purchase Power Agreement. The letter states, in pertinent part, as follows:

> Our preliminary position in this matter was expressed as follows:
>
> *New Fontana Agreement (TV-23701A)*
>
> The parties to this Agreement are TVA, Tapoco, Inc., and Nantahala Power and Light Company. *It is our position that this contract be renegotiated to result in two distinct contracts; one between TVA and Nantahala, and another between TVA and Tapoco.*
>
> [Alcoa's position as to the specific terms of the Tapoco-TVA contract are outlined to include, *inter alia*, a contract term to parallel the remaining Federal Power Commission ("FPC") License period (2005); removal of TVA interruption rights, and establishment of a firm amount of power to Tapoco based, *inter alia*, upon historical generation from Tapoco developments.]
>
> *With regard to Nantahala, negotiations will be handled by that entity and should consider its resources separate from Tapoco.* We promise to promote an early meeting between Bill Jontz, President of Nantahala, and TVA to review Nantahala's position and matters of future mutual interest. (Emphasis added.)

Thus, when Nantahala first approached TVA about power supply negotiations in 1979, Nantahala officers had no apparent alternative but to proceed with separate negotiations with TVA. As late as 1981, TVA expressed a desire to Tapoco to continue

the same parties to the new agreement. Eventually, TVA agreed to separate negotiations sometime in 1981 after determining that there were no "disbenefits" or disadvantages to TVA under such an arrangement.

Looked at from the point of view of Nantahala, however, the evidence does not appear to support a conclusion that there were no disadvantages to separate negotiations. In fact, there had to be a considerable loss of negotiating strength for Nantahala by division of the total Alcoa forces in bargaining with TVA. The Tapoco-TVA Agreement is considerably better for Alcoa and Tapoco than the NFA. The record reveals that Tapoco achieved most of its negotiating goals, with the exception of receiving full credit for the dependable capacity given to TVA over and above Tapoco's 185 megawatt return entitlement. On the other hand, Nantahala's negotiating team could have used both the clout and leverage of Alcoa and Tapoco's resources to improve its bargaining position. For example, at one negotiating table Tapoco (Alcoa) was attempting to get credit for excess dependable capacity, while at another negotiating table Nantahala was negotiating for the purchase of deficit capacity. At one negotiating table, Tapoco (Alcoa) was tying down arrangements which resulted in levelized annual entitlements, while at another negotiating table Nantahala was being excised from the integrated operation and energy exchange concept. In addition, Alcoa, at one negotiating table, was purchasing its deficit power from TVA at standard rates based on average system costs, while at another table Nantahala had to accept incremental energy purchases from TVA at a far higher rate.

In addition to the evidence presented by the intervenors and the companies regarding the negotiations and operational terms of the Fontana III Agreements, the intervenors also presented voluminous evidence on the issues for which they had previously sought application of the doctrine of res judicata or judicial notice. Insofar as the intervenors' evidence concerns the historical development, design, operation, and location of the Nantahala and Tapoco hydroelectric system, the public utility status of Alcoa and Tapoco and Alcoa's domination of these subsidiary utility companies, the evidence of record in the Sub 44 proceeding is virtually identical to the evidence presented in the Sub 29 (Remanded) and Sub 35 proceedings, discussed at length in *Nantahala I*.

As to the factual circumstances concerning Tapoco's status as a North Carolina public utility, absolutely no change in condition has been shown to have occurred since entry of the Commission's prior orders. Similarly, the evidence again demonstrated the existence of a single electric system composed of the dams, transmission, and distribution lines of Nantahala and Tapoco by location, design, and history and owned by a single corporation parent, Alcoa. The only circumstance which has changed under the Fontana III Agreements is the fact that the hydro resources of the single system are no longer coordinated as a single unit by TVA by virtue of the contractual agreement with the Alcoa system as they were under the OFA and NFA. Under Fontana III, only the four hydroelectric plants of Tapoco are dispatched by TVA against the TVA load in exchange for return power entitlements. As a result of Nantahala's exclusion from the terms of the 1983 Tapoco-TVA Exchange Agreement, Nantahala dispatches its own generation and has accordingly been required to install $100,000 worth of equipment for dispatching purposes.

In all other material respects, the evidence introduced by the intervenors indicates that very little has changed in the conditions under which Nantahala and Tapoco operate. There has been no change in Nantahala's production capability or in its physical interconnection with Tapoco. Nantahala continues to serve the same assigned area, including the portion of North Carolina in which Tapoco Village, Santeetlah, and Cheoah are located; and Tapoco continues to own the Santeetlah and Cheoah power facilities. Obviously, no change has occurred in the history of the system's design and, in essence, Nantahala remains by its historical development a component part of a unified system, since it was not designed to operate as a stand-alone utility. The legacy of this development in terms of power supply is the undeniable fact that Nantahala's generation is still not adequate to serve its public load, and Nantahala is still constrained to purchase its supplemental power and energy from TVA. Under the terms of its new agreement, Tapoco exchanges power with TVA much the same as it did under the 1962 New Fontana Agreement, and Nantahala, under its 1983 Interconnection Agreement, continues to sell power to TVA when it has excess generation to dispose of.

In other words, the only change that has occurred with respect to the "single system" since the two prior rate orders

were entered by the Commission, and affirmed on appeal, is the single fact that new power supply contracts with TVA were entered into and, as an incident to the change, Nantahala dispatches its own generation. The evidence also indicates that under the new arrangements, Nantahala is dispatching its plants in much the same way as TVA had under the NFA.

The remaining factual issues which the intervenors contend were also raised and conclusively demonstrated by their evidence concern Alcoa's status as a statutory North Carolina public utility and Alcoa's domination of Nantahala to the detriment of the interests of Nantahala's public customers. Once again, the intervenors presented virtually identical evidence in support of both propositions as had been presented in the two preceding rate cases, where the Commission had conclusively found that "Alcoa has so dominated certain transactions and agreements affecting its wholly owned subsidiary Nantahala that Nantahala has been left but an empty shell, unable to act in its own self interest, let alone in the interest of its public utility customers in North Carolina." This finding of fact, initially made in the Sub 29 (Remanded) order in September 1981, was repeated by the Commission verbatim in its June 1982 Sub 35 order, and affirmed on appeal in *Nantahala I* and *Nantahala II.*

Once again, the only relevant factual change in circumstance since entry of these orders has been the execution of the Fontana III Agreements. In all other respects, the evidence presented demonstrated no structural change in the relationship between Alcoa and its wholly owned subsidiary. In addition, the evidence indicates that although Nantahala is facing a period of financial need as it attempts to repair and expand its facilities by seeking an $8 million loan from outside sources, Alcoa will not provide a "comfort letter" for its subsidiary and has actually lessened its investment in Nantahala from its pre-1976 level. In that year, Alcoa converted half of its $19 million equity investment in Nantahala into $8.9 million of debt, which debt has now been reduced to $3.3 million. That is, Alcoa has withdrawn, in cash, approximately $5.5 million of its former equity investment in Nantahala during a period of financial need for the payment of Nantahala's refund obligations and other capital expenditures.

More to the point, however, is the significance of the new or additional evidence as to Alcoa's role in the Fontana III negotiations on the questions of corporate dominance and whether Alcoa's affiliation continues to have an effect on Nantahala's rates or service so that Alcoa remains a North Carolina public utility under the provisions of N.C.G.S. § 62-3(23)c. Although Nantahala presented evidence at the Sub 44 hearings that it had determined to negotiate the 1983 Interconnection Agreement without direction from Alcoa, the inescapable fact remains, as the Commission itself concluded in the Sub 35 order, that in the year 1977 Alcoa decided, without prior consultation with Nantahala officials, that Nantahala should negotiate a New Fontana Agreement renewal separate from Alcoa and Tapoco; a decision which effectively "forced" Nantahala into separate negotiations. Nantahala's president, William Jontz, was, as noted in *Nantahala I*, 313 N.C. at 666, n. 20, 332 S.E. 2d at 428, n. 20, then under contractual agreement with Alcoa to manage Nantahala so as to have "little or no adverse impact on the operations and assets" of Alcoa and its other subsidiaries. Jontz subsequently denied that he was even aware of the Alcoa decision to have separate negotiations and contracts.

Moreover, Nantahala was never shown to have approached Alcoa regarding joint negotiations and no studies were conducted by any of the parties to determine whether separate negotiations would be beneficial to Nantahala. As a result of the separate negotiations, Tapoco was able to enter into a contract with TVA similar to and more beneficial than the NFA. On the other hand, Nantahala was unable to enter into the kind of exchange agreement that it sought originally and that TVA originally had considered offering to Nantahala.

Although Nantahala was undeniably freed from some of the grosser inequities of the combined effect of the NFA and the 1971 Apportionment Agreement by its 1983 Interconnection Agreement with TVA, Nantahala was once again effectively put at a disadvantage by having its resources separated from those of the comprehensive Alcoa power system it had been a part of for over forty years. *See Nantahala I*, 313 N.C. at 669, 332 S.E. 2d at 430. Nantahala's vice president, N. Edward Tucker, conceded that Nantahala failed to obtain virtually any of its major goals in these negotiations—for example, an exchange contract, a twenty-year term, hydro credit, or average energy cost—which would have

been beneficial in view of its customer load and demand. Although Alcoa did not directly participate in the Nantahala-TVA negotiations as it had in the past, the weakened bargaining position in which Alcoa left Nantahala, after having been somewhat less than a fully independent public utility for most, if not all, of its corporate existence, may be viewed to have led directly to the results which followed.

Clearly, the issue raised by this evidence is not the objective fairness of each separate aspect of the 1983 Interconnection Agreement viewed in a historical vacuum, but rather the fairness of Alcoa's de facto contractual allocation of the power supply resources of western North Carolina between the public load served by Nantahala and the private industrial load served by Tapoco. Unfortunately, it is evident that the Commission has failed, in its order, to give this, and the other related issues raised by the intervenors' evidence, appropriate consideration *before* undertaking to answer the question, in its discretionary authority, of whether a roll-in rate methodology remains appropriate for setting Nantahala's retail rates.

III.

The Commission's Sub 44 orders which are under review in this appeal do not, except in the most minimal and indirect manner, deal with any of the four issues raised by the intervenors. Of the twenty-five findings of fact set forth in the panel order as subsequently adopted by the Full Commission, it cannot be said that any of them deal, in any final or adjudicative fashion, with the issues raised as to the public utility status of Alcoa and Tapoco, the existence of a single, unified electric system comprised of the properties of Nantahala and Tapoco, and the domination of that single system by its common parent Alcoa from the date of its inception until, at the very least, the date of the Commission's last preceding general rate order in the Sub 35 proceeding, 8 June 1982. Moreover, no finding of fact or discussion of the evidence addresses the far larger and more important question of Alcoa's role in the ultimate division and allocation of the power supply resources of the single Nantahala-Tapoco electric system. This issue is of central importance because the using and consuming public of North Carolina has been previously determined to have rights in this single system, given the way in

which its various resources were developed to carry both a public service obligation and a private customer responsibility.

Of the twenty-five findings of fact contained in the order appealed from, only Findings of Fact Nos. 6, 7, 8, 9, and 10 appear to address the roll-in related issues. Of these findings, not one addresses the issues of Tapoco and Alcoa as North Carolina public utilities, or of Alcoa's historic domination of Nantahala. To the extent that the intervenors' fourth issue, concerning the Nantahala-Tapoco single system, is treated at all, it is treated only by negative implication in Finding of Fact No. 9, in which the Commission states:

> *The Nantahala electric system should be treated independently of Tapoco* in this proceeding with respect to all matters affecting the determination of Nantahala's reasonable cost of service applicable to its North Carolina retail operations. *Under the 1983 Interconnection Agreement, Nantahala is a stand alone hydroelectric power company* which operates its 11 hydroelectric generation stations for the sole benefit of its customers, all of which are in North Carolina, without any obligation to or regard for the TVA or Tapoco hydro stations in North Carolina and Tennessee or for Alcoa's power use in Tennessee. (Emphasis added.)

Finding of Fact No. 6 catalogues the benefits of the 1983 Interconnection Agreement with respect to Nantahala's exclusive retention of its own generation; independent control of its generating facilities; control of its water releases; unfettered ability to sell its surplus power to TVA; and assured supply of supplemental and back-up power and energy from TVA, without limitation, at such times as the company's own generation cannot meet its load due to such exigencies as adverse water conditions or equipment outages. At the conclusion of this finding, the Commission states: "Nantahala's North Carolina retail rates should, therefore, be established in this proceeding in recognition of and pursuant to the more favorable terms and benefits of the 1983 Interconnection Agreement."

The issue of Alcoa's domination of Nantahala with respect to the 1983 Interconnection Agreement is never directly addressed in the order, as was the case with the single system issue. Rather,

it is indirectly touched upon in Findings of Fact Nos. 7 and 9. In relevant part, these findings state as follows:

> 7. The New Fontana Agreement and 1971 Apportionment Agreement resulted in substantial concealed benefits accruing to Alcoa to the significant detriment of the customers of Nantahala. No direct benefits now accrue to Alcoa as a result of the 1983 Interconnection Agreement to the detriment of Nantahala's customers. Furthermore, if any indirect benefits enure to Alcoa as a result of said agreement, any such indirect benefits do not appear to be the result of unlawful preference having been shown to Alcoa by Nantahala to the significant detriment of Nantahala's customers.
>
> . . . .
>
> 9. . . . Further, Alcoa receives no power or any other direct benefit from Nantahala's power generation. All of the benefits of the generation from Nantahala's entire hydroelectric system are retained exclusively for the use and benefit of the North Carolina customers of Nantahala, whose entire service is confined to its service area in North Carolina.

From a combination of its findings that under the 1983 Interconnection Agreement Nantahala "is" a stand-alone hydroelectric power company, retaining all of the benefits of its generation and passing no direct benefits to Alcoa, the Commission appears to have made its further finding of fact that "the roll-in methodology advocated herein by the Intervenors and previously utilized by the Commission in prior dockets in making cost of service allocations is not appropriate for use in setting Nantahala's retail rates in this proceeding."

N.C.G.S. § 62-79(a)(1) requires the Commission, in general rate cases, to consider controverted questions by making findings and conclusions and by setting forth the reason or basis therefor "upon all the material issues of fact, law or discretion presented in the record." The Commission must give more than minimal consideration to the evidence supporting an issue necessary to a proper determination of the rights of the parties and failure to do so is reversible error. *Edmisten*, 299 N.C. at 443, 263 S.E. 2d at 588. " 'A failure to find facts essential to a determination of the

rights of the parties necessitates a remand to the . . . agency charged with that responsibility.'" *Utilities Comm. v. Farmers Chemical Assoc.*, 33 N.C. App. 433, 446, 235 S.E. 2d 398, 405, *disc. rev. denied*, 293 N.C. 258, 237 S.E. 2d 539 (1977) (*quoting Utilities Commission v. Membership Corporation*, 260 N.C. 59, 69, 131 S.E. 2d 865, 871 (1963) ).

The intervenors contend that had the Commission addressed the issues (and evidence in support thereof) raised by them in a final and adjudicative fashion, it is likely that a different result would have been reached in this case. They contend that the question of whether to set Nantahala's rates on a rolled-in basis cannot be rationally answered without *first* addressing the issue of the single Nantahala-Tapoco public utility system and Alcoa's financial responsibility under Chapter 62 of the North Carolina General Statutes. In essence, the intervenors contend that the latest order of the Commission does not refute the findings, discussion, and conclusions reached by the Commission in the Sub 29 (Remanded) and Sub 35 orders, it merely misses the mark with respect to *all* material facts of record relevant to the question of what are reasonable and just rates for Nantahala *including but not limited to the new power supply agreements* between the member companies of the "Alcoa power system" and TVA. The companies do not challenge the fact that the Commission failed to address the issues raised by the intervenors. Rather, they argue that having decided the "ultimate" issue of roll-in against the intervenors, it became unnecessary for the Commission to answer the four other issues. We do not agree.

The Commission correctly determined in both this and the Sub 35 case that the factual and legal framework in any given general rate case may be such that a roll-in methodology appropriate at one point in time will not necessarily be warranted in a later proceeding. Therefore, the Commission properly deferred its decision as to whether to utilize the roll-in methodology developed in the Sub 29 (Remanded) case until the issue was properly raised through the evidence presented at the hearings on Nantahala's latest rate increase request. However, as between the same parties, on a substantially identical record, and within a one-year time span, the nature of the underlying issues which must necessarily be considered relevant to that question are not likely to vary. Having twice determined that it was necessary to

a proper resolution of the roll-in issue to determine the four other issues raised by the intervenors, it becomes incumbent upon the Commission to also address these issues directly and in a final and adjudicative fashion in the next ensuing general rate case involving the same parties and contentions. We find the Commission's total failure to address the issues raised by the intervenors in such a manner completely inconsistent with its previous determinations and orders in the Sub 29 (Remanded) and Sub 35 cases, as well as inconsistent with its pre-hearing determinations in this docket joining Alcoa and Tapoco as parties and ordering roll-in data to be supplied.

In our discussion of the evidence presented in the Sub 44 proceedings, we have not undertaken to say what weight the Commission is to give to the testimony of the various witnesses and exhibits presented or to the documentary evidence which, if believed by the Commission, would support essential findings that were not made on the four issues raised by the intervenors. The credibility of the evidence and the weight to be given to it are matters for the Commission to determine. *Nantahala I*, 313 N.C. at 744, 332 S.E. 2d at 473; *Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 208 S.E. 2d 681 (1974); *Utilities Comm. v. Farmers Chemical Assoc.*, 33 N.C. App. 433, 235 S.E. 2d 398. Because the Commission has failed to find facts essential to a determination of the rights of the parties with respect to the issues of the public utility status of Alcoa and Tapoco, the existence of a single, unified electric system comprised of the properties of Nantahala and Tapoco, and the domination of Nantahala by Alcoa so as to require piercing of the corporate veil between them, this matter must be remanded to the Commission for entry of the necessary findings and conclusions on these issues upon which it may base its order.

The remaining arguments presented by the intervenors regarding the Sub 44 order concern the Commission's decision to set Nantahala's rates on a stand-alone basis and the Commission's apparent determination that a roll-in methodology could not be utilized absent either a voluntary commitment on the part of Alcoa to support Nantahala financially as to future rolled-in rates or an order by FERC directing the physical sale of Tapoco power to Nantahala. We turn next to these questions.

IV.

As we have indicated, the Commission erroneously failed to consider and address all material factual issues necessary to answer the critical question of whether there *is*, in fact, a single Nantahala-Tapoco electric system despite the execution of the Fontana III Agreements and, if so, whether Nantahala's rates and service for its North Carolina rate payers will be improved if rates are set on a single system basis utilizing the roll-in methodology proposed by the intervenors and previously employed by the Commission on two occasions in setting Nantahala's retail rates. Nothing in the Sub 44 order purports to even address this question. The portions of the order which do discuss the roll-in methodology indicate that the Commission began and ended its analysis with its consideration of: (1) "the more favorable terms and benefits of the 1983 Interconnection Agreement" (Finding of Fact No. 6); (2) the fact that "[n]o direct benefits now accrue to Alcoa as a result of the 1983 Interconnection Agreement to the detriment of Nantahala's customers" (Finding of Fact No. 7); (3) the fact that "[u]nder the 1983 Interconnection Agreement, Nantahala is a stand alone hydroelectric power company" (Finding of Fact No. 9); and (4) the consequence that "[a]ll of the benefits of the generation from Nantahala's entire hydroelectric system are retained exclusively for the use and benefit of the North Carolina customers of Nantahala" (Finding of Fact No. 9). In consequence of the foregoing, Finding of Fact No. 9 concludes: "Thus, the roll-in methodology advocated herein by the Intervenors and previously utilized by the Commission in prior dockets in making cost of service allocation is not appropriate for use in setting Nantahala's retail rates in this proceeding."

In its discussion of these findings, the sole reason articulated by the Commission in support of its decision to not utilize the roll-in methodology is as follows:

> *The Commission reaffirms its previous findings and conclusions made in Docket Nos. E-13, Sub 29 (Remanded) and E-13, Sub 35, to the effect that the 1962 New Fontana Agreement and the 1971 Apportionment Agreement resulted in the accrual of substantial concealed benefits to Alcoa to the significant detriment of the customers of Nantahala. However, effective January 1, 1983, Nantahala entered into a*

*separate agreement with TVA under which Nantahala re-*
*tains, dispatches and controls the generation from its own*
*hydroelectric generating plants, and under which Nantahala*
*purchases supplemental and standby power from TVA.* Effec-
tive January 1, 1983, Tapoco also entered into a separate
agreement with TVA under which Tapoco conveys the gener-
ating output of its hydroelectric plants to TVA in return for
entitlements from TVA which Tapoco uses to provide power
to Alcoa in Tennessee. *The execution of these new agree-*
*ments with TVA substantially removes the underpinnings*
*upon which rested the Commission's previous determinations*
*that the roll-in methodology was appropriate.* (Emphasis
added.)

First, in view of the Commission's previous orders, the deci-
sion to base Nantahala's rates on its "stand-alone" book costs on
such limited findings as those recited above—essentially that
Nantahala is "better off" under the new agreement with TVA
than under the former agreements with TVA and Tapoco—cannot
be considered an exercise of sound and reasoned discretion on the
part of the Commission. In addition, the Commission's discussion
of the rationale behind the roll-in rate making technique utilized
in the Sub 29 (Remanded) and Sub 35 proceedings indicates that
in Docket No. E-13, Sub 44, the Commission took an unnecessarily
and erroneously narrow and restrictive view of this Court's deci-
sion in *Edmisten*, 299 N.C. 432, 263 S.E. 2d 583, and of the scope
of its own previous orders.

Although it is true that *one* of the purposes for the roll-in
method of rate making is to "cancel" or at least to "true-up" con-
cealed benefits that the Commission found flowing to Alcoa under
the power supply agreements then in effect (*see Nantahala I*, 313
N.C. at 682-83, 332 S.E. 2d at 437), the central and overriding pur-
pose of this technique remains its usefulness, for rate making
purposes, in preventing Nantahala, as an integral unit in a com-
prehensive power system owned by a single corporate parent,
from concealing excessive rates to its retail customers through
the mechanisms of separate corporate structure and intercor-
porate contractual agreement. As we stated in *Edmisten*:

The "roll-in" device, or technique, for rate making computa-
tion seems especially appropriate in a case such as this where

one physically integrated system, interconnected in such a way that all power available to the system can be used to enhance its overall reliability and supply its requirements as a whole, is presided over by two corporate entities. (Citation omitted.) This is especially true when both corporate entities are wholly owned by a parent corporation which benefits from the power generated by the system. This device does nothing more than recognize that the two corporate entities ought, for rate making accounting purposes, be treated as the one electrical power producing and distribution system which, in fact, they are. If then unlawful preferences are indeed accorded to Alcoa to the detriment of Nantahala's customers because of the separate corporate structures and the inter-corporate apportionment agreements, this rate making device would seem to eliminate them.

299 N.C. at 442-43, 263 S.E. 2d at 591.

In the present case, the Commission began its discussion of the stand-alone rate making technique by stating that "[i]n Docket No. E-13, Sub 29 (Remanded) and E-13, Sub 35, this Commission found that the Nantahala and Tapoco electric facilities constituted a single, integrated electric system and were operated as such by TVA as a coordinated part of the TVA system." Following this statement is a list of the evidence relied upon by the Commission in making that ultimate finding. The only fact which the Commission then points to as removing the "underpinnings" of its previous use of the roll-in is the fact that under the 1983 agreement, Nantahala retains, dispatches, and controls the generation from its own hydroelectric generating plants, rather than subjecting them as a unit with Tapoco's plants to TVA's control and receiving levelized entitlements in return for its generation and dispatching rights.

It is abundantly clear from the Commission's findings and conclusions that the decision to establish Nantahala's rates on a stand-alone basis, which resulted in an actual increase of 32 percent over the rates approved by the Commission less than one year earlier in Docket No. E-13, Sub 35, resulted from its failure to focus upon all the material issues raised by the evidence presented. Taken on a provision-by-provision basis, the 1983 In-

terconnection Agreement is an undeniable improvement over the NFA and 1971 Apportionment Agreement in that Nantahala is no longer deprived of even the benefits of its own generation and capacity and control over the dispatch of its own plants. However, the fact remains, as noted by the Commission in its order, that Nantahala can only "supply most of its customers' needs from its own hydroelectric generation during normal water conditions and average consumption periods." During low water or peak consumption periods, and over time, because of anticipated growth in customer load, Nantahala must supplement its available generation by outside purchases of power from TVA or some other source, and this generational deficiency remains the primary problem facing Nantahala and its rate payers.

The full impact of the decision, reflected in the 1977 Jones letter[3] that Nantahala negotiate separately with TVA at the expiration of the NFA and consider its resources separately from those of Tapoco can only be adequately assessed against the historical position of Nantahala's having been less than a fully independent public utility for forty years in terms of design, development, and long-term planning for the future needs of its customers. It would appear that the simple act of contractually severing Nantahala from the power exchange concept and unified operation of the hydroelectric resources of the Little Tennessee River, at a time when Nantahala's own generation is insufficient to meet the demands of its existing public load during periods of peak consumption and/or adverse water conditions, could only aggravate the difficult situation facing Nantahala and its rate payers in the future.

One of the more perplexing "findings" in the Sub 44 order appears to acknowledge this problem, if only indirectly. Finding of Fact No. 10 states: "Nantahala should actively and thoroughly investigate and pursue alternatives to purchasing power from TVA, including, in particular, power purchases from Tapoco, in order to secure for its retail ratepayers purchase power at the lowest possible cost." Nantahala's "pursuit" of power purchases from Tapoco is obviously the subject of the relief being sought before the "appropriate federal jurisdiction"—the FERC—which is re-

---

3. *See* discussion of this letter in Part II, *supra.*

ferred to in Finding of Fact No. 8, a remedy sought by both the intervenors and the Commission itself. Such an order is necessitated by Tapoco's apparent refusal to voluntarily sell power to its sister corporation Nantahala.

In the discussion of this finding, the Commission indicates that it is of the opinion that "[n]otwithstanding the fact that the 1983 Interconnection Agreement between Nantahala and TVA provides substantial benefits to the Company's retail rate payers which were not present under the 1962 New Fontana Agreement and the 1971 Apportionment Agreement," it remains the Commission's conclusion that some other form of power supply arrangement ought to be pursued by Nantahala. This discussion and conclusion would appear to acknowledge that despite the improvements represented by the terms of the 1983 Interconnection Agreement over its predecessor agreements, Nantahala has once again failed to enter into the type of long-term power supply contract necessary to meet the needs of a public utility which for the first time in forty years must "stand-alone" and attempt to satisfy its substantially increased public load, with no more generating capacity than it possessed nearly thirty years ago. *See Nantahala I*, 313 N.C. at 638, 332 S.E. 2d at 412.

When the OFA, NFA, and various apportionment agreements are viewed in their proper perspective, as mechanisms in a power supply arrangement which allocated the total hydro resources of the "Alcoa power system" between the private use of Alcoa and the public load of Nantahala, it would appear that the Fontana III Agreements are also power supply mechanisms which, taken together, indirectly benefit Alcoa by allocation of the system's more costly power to Nantahala, while Alcoa took, through its other subsidiary, Tapoco, the lower cost generation from the system's larger projects. This issue, concerning the nature and impact of "any indirect benefits" flowing to Alcoa by virtue of the new power supply agreements is only hinted at in the Commission's order. At no point does the Commission give any indication as to what those "indirect benefits" that it has perceived consist of, or of their impact on Nantahala's rates and service. Moreover, the Commission's conclusion that "if any indirect benefits enure to Alcoa as a result of said agreement, any such indirect benefits do not appear to be the result of unlawful preference having been shown to Alcoa by Nantahala to the significant detriment of Nan-

tahala's customers" is somewhat surprising in view of its previous determinations in the Sub 29 (Remanded) and Sub 35 cases that Nantahala, "an empty shell, unable to act in its own self-interest," had been "forced" into separate negotiations with TVA for a new agreement "by the Alcoa-Tapoco decision to exclude Nantahala's interest from its negotiations with TVA." Obviously, as the Commission has itself previously perceived, the question with respect to indirect benefits to Alcoa primarily involves the issue of *parental domination over the subsidiary*, which *results* in preferences being accorded the parent by the subsidiary, and not vice versa.

[2]   Again, we have undertaken the foregoing discussion of the evidence and contentions of the parties in an effort to delineate the scope of the inquiry and nature of the issues which were not addressed by the Commission in the Sub 44 order, and which must be addressed in a final and adjudicative fashion upon remand of this case. In this regard, we note that in addition to the four issues specifically raised by the intervenors as discussed in Part III of this opinion, the Commission, in evaluating the effect of the new "stand-alone" agreements on Nantahala's costs of service, must address in a direct and final manner the issue of indirect benefits to Alcoa resulting from the exclusion of Nantahala from the successor agreement to the NFA, the 1983 Tapoco-TVA Exchange Agreement, and whether a roll-in will "cancel" or "true-up" any such indirect benefits as may be found to enure to Alcoa from this changed circumstance.

V.

In their final argument, the intervenors challenge the Commission's determination that it could not set Nantahala's rates on a rolled-in basis absent either a voluntary commitment on the part of Alcoa to support Nantahala financially should any revenue shortfall occur under a roll-in, or an order by FERC directing the physical sale of Tapoco power to Nantahala. This determination appears to be contained within Finding of Fact No. 8, which states:

> *The roll-in methodology proposed herein by the Intervenors for pro forma purposes in fixing Nantahala's rates without any accompanying order from the appropriate federal jurisdiction requiring the physical sale of Tapoco power to Nantahala or a guarantee of Nantahala's financial integrity*

*by Alcoa* will ultimately result in insolvency or bankruptcy of Nantahala and an inability of Nantahala to meet its customers' needs for electric power, and will not serve the best interests of Nantahala's customers or its service area in North Carolina. Further, if and when the federal jurisdiction having authority to allocate Tapoco power to the Nantahala service area should order such allocation, then the Commission can reopen this docket to readjust the rates of Nantahala to reflect the actual cost of such purchases from Tapoco as may be approved by said federal jurisdiction. (Emphasis added.)

The intervenors contend that the Commission's reasoning is flawed in two respects: (1) the Commission has grossly underestimated its regulatory authority over Alcoa, should it again determine that Alcoa is a North Carolina public utility under N.C.G.S. § 62-3(23)c, and (2) its analysis that rolled-in rates will lead Nantahala into bankruptcy is completely inconsistent with its own prior orders in Docket Nos. E-13, Sub 29 (Remanded) and Sub 35.

It is evident from this finding that the Commission's decision not to adopt the roll-in methodology rests, in part, upon its erroneous assumption that it is powerless to compel Alcoa's financial support of its subsidiary Nantahala's future rates. Such a determination on the part of the Commission is clearly erroneous. As we observed in *Nantahala I*, "pursuant to N.C.G.S. § 62-30, the Commission is vested with broad authority to insure the effective regulation of public utilities in North Carolina, including 'all such . . . powers and duties as may be necessary or incident to the proper discharge of its duties.' " 313 N.C. at 723, 332 S.E. 2d at 461. *See also id.* at 724, n.23, 332 S.E. 2d at 462, n.23. Further, in rejecting Alcoa's argument that the Commission lacked a legal basis for holding it financially responsible for Nantahala's refund obligation, we stated:

It is beyond dispute that Nantahala's financial stability and hence its ability to serve the public depends on Alcoa's ultimate legal responsibility to stand behind the refund obligation. The broad grants of authority to the Commission to ensure the effective regulation of Nantahala and the full protection of Nantahala's customers would be rendered nugatory if, upon a finding that its parent's affiliation had severely and detrimentally affected Nantahala's rates and ability to

effectively provide service in its franchise area, the Commission were powerless to order remedial action against the parent corporation. . . .

. . . .

Therefore, once the Commission determined that Alcoa was a statutory public utility under N.C.G.S. § 62-3(23)c, it could rely upon the doctrine of "piercing the corporate veil" between Nantahala and its parent to hold Alcoa financially responsible for Nantahala's refund obligation to the extent its affiliation had adversely affected Nantahala's rates as "necessary or incident" to the proper discharge of its regulatory duties under Chapter 62. N.C.G.S. § 62-30. Accordingly, we reject Alcoa's argument that there is no statutory or legal basis for its refund liability.

313 N.C. at 724, 726, 332 S.E. 2d at 462, 463.

[3]   In its two previous orders implementing a roll-in rate making methodology, the Commission has not hesitated to place financial responsibility upon Alcoa for any portion of Nantahala's refund obligation as Nantahala is itself unable to pay while continuing to render adequate service to its customers. The relief ordered by the Commission, and affirmed by this Court, in the two prior rate cases is essentially the same relief sought by the intervenors in this case. There is no principal distinction between a refund financed by Alcoa to rate payers on the basis of excessive rates charged by Nantahala over a historic period and a periodic payment by Alcoa to Nantahala for any current or future revenue shortages on Nantahala's books which may result from prospective rolled-in rates. Both forms of relief are merely ancillary to the establishment of a just and reasonable rate schedule as approved by the Commission for Nantahala. Thus, assuming, *arguendo*, that the Commission again finds that Alcoa is a North Carolina public utility pursuant to N.C.G.S. § 62-3(23)c, it may also require Alcoa, as a public utility, to protect Nantahala financially as to future rates, in much the same way as it has been held responsible for past locked-in rates in *Nantahala I* and *Nantahala II.*

[4]   In short, upon the appropriate findings of fact, the Commission is well-endowed with powers under the provisions of Chapter

62 of the North Carolina General Statutes to protect Nantahala from financial hardship as to any past rates collected in Docket No. E-13, Sub 44 which are determined to be excessive by requiring Alcoa to make refunds, just as had been required in the two prior general rate cases. As to future rates, Nantahala can be protected from any financial hardship that the Commission may determine to result from rolled-in rates simply by requiring Alcoa to periodically (monthly) pay to Nantahala any revenue shortfall which appears in Nantahala's accounting data as a result of Alcoa's decision to maintain separate corporate entities for Nantahala and Tapoco. If, as the intervenors contend, the evidence warrants findings that Alcoa designed the subsidiaries and the single system in such a manner that Nantahala's status as a stand-alone utility under the Fontana III Agreements works to the detriment of Nantahala and its customers under current operating conditions, then the Commission, should it choose to do so, would be acting well within its regulatory authority in calling upon Alcoa to support Nantahala financially.

One final aspect of the Commission's order which warrants comment is the discussion concerning Nantahala's access to Tapoco's hydro generation. In its discussion of Finding of Fact No. 8, the Commission correctly noted that the roll-in technique does not make the benefits of Tapoco's generation available to Nantahala. That is, the roll-in does not effectuate a diversion of energy and capacity entitlements returned to Tapoco by TVA under the system's exchange arrangements, it is merely an accounting technique to determine rate base, revenues, and to allocate costs among jurisdictional customers. The Commission goes on to state that the "Intervenors and this Commission have now requested relief before the Federal Energy Regulatory Commission (FERC), regarding the issue of access by Nantahala to Tapoco power, an issue which should properly be decided in that forum by FERC." The text that follows this statement merely repeats the contents of Finding of Fact No. 8, indicating that the Commission would re-open this docket should FERC order the requested relief.

On 26 February 1985, the Administrative Law Judge ("ALJ") presiding over the consolidated cases concerning the new power supply agreements with TVA issued an initial decision approving, with conditions, the proposed tariff changes effectuated by the execution of the Fontana III Agreements. Tapoco, Inc., Initial Deci-

sion, 30 F.E.R.C. ¶ 63,050 (1985). The ALJ found that in order to safeguard Nantahala and its rate payers from the effects of some of the proposed changes from the prior Fontana arrangements, approval of the Fontana III Agreements would have to be subject to specific conditions pursuant to Sections 205 and 206 of the Federal Power Act. In particular, the ALJ determined that to reduce the vulnerability of Nantahala's customers stemming from the fact that Nantahala will have to stand alone as an independent public utility for the first time in over forty years without having the wherewithal, from either a financial or electric generating standpoint, to meet its load, conditions would be necessary to allow Nantahala a "breathing space" while it attempts to become a self-sufficient public utility. *Id.* at pp. 65,286-91.

The conditions imposed in the order give Nantahala and its rate payers a priority to take some of the low-cost power from the Cheoah and Santeetlah hydroelectric plants which otherwise goes to Tapoco or Alcoa after the coordination and exchange arrangements occur with TVA, for a temporary period lasting until Nantahala has adequate and reliable generating capacity to serve its customers.

> In other words, the priority will end when Nantahala has enough capacity which not only allows the company to meet its customers' entire load, but also enables it to hold in reserve an amount sufficient to assure uninterrupted service at all times at a reasonable cost.
>
> A reasonable cost is perhaps the most pivotal factor here.

30 F.E.R.C. ¶ 63,050 at p. 65,288. After discussing alternative routes which Nantahala may take towards attaining self-sufficiency, the ALJ added:

> Apart from the self-generation or purchasing requirements set forth above, it will be sufficient to ascertain when and if Nantahala has fulfilled its generating capacity-obligation by using the guidelines set by the Southeastern Electric Reliability Council (SERC) . . . . On condition that both the guidelines of the SERC and the requirements outlined above have been satisfied, Nantahala would be deemed

to be a truly independent public utility which no longer, on behalf of its ratepayers, would be entitled to a priority to the low-cost power that would revert to Tapoco or Alcoa.

*Id.* at pp. 65,288-89.

The ALJ's initial decision was quickly challenged by Tapoco, *in particular, on various grounds.* On 17 May 1985, the presiding judge ruled upon the motions for reconsideration submitted, and summarily rejected all of the companies' arguments against conditions imposed on the Fontana III Agreements. Tapoco, Inc., Rulings Upon Motions for Reconsideration of Initial Decision, 31 F.E.R.C. ¶ 63,056 (1985). Thus, the Commission may take the opportunity presented by the remand of this case for further proceedings to evaluate the impact of these decisions upon Nantahala's costs of service.

## VI.

[5] The intervenor Jackson Paper Manufacturing Company presents two questions for review which are entirely separate from the roll-in issue. Jackson Paper argues that the Commission's decision refusing to establish a new rate class for Large Industrial Service (LIS) as proposed by Jackson Paper is not based upon substantial evidence and that it unlawfully discriminates against Jackson Paper in violation of N.C.G.S. § 62-140.

Jackson Paper correctly notes in its brief that upon appeal, orders entered by the Commission "shall be prima facie, just and reasonable," pursuant to N.C.G.S. § 62-94(e), but that this provision does not preclude an aggrieved party from showing that the evidence offered rebuts the prima facie effect of the order and that the order was unsupported by competent, material, and substantial evidence in view of the entire record. N.C.G.S. § 62-94(b) (5) and (6). However, we do not agree with appellant's contention that Finding of Fact No. 25, which states that "[t]he proposed rate schedule LIS (Large Industrial Service) should not be approved in this proceeding," is in fact unsupported by the requisite evidentiary showing. Nor do we agree with the contention that the Commission unlawfully discriminated against Jackson Paper by its failure to establish a separate LIS rate for its service.

Initially, we note that the burden of showing the impropriety of rates established by the Commission lies with the party alleg-

ing such error. *Utilities Comm. v. Carolinas Committee*, 250 N.C. 421, 109 S.E. 2d 253 (1959). "The rate order of the Commission will be affirmed if upon consideration of the whole record we find that the Commission's decision is not affected by error of law and the facts found by the Commission are supported by competent, material and substantial evidence, taking into account any contradictory evidence or evidence from which conflicting inferences could be drawn." *Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 10, 287 S.E. 2d 786, 792 (1982).

The evidence before the Commission shows that Jackson Paper acquired a paper mill located in Sylva, North Carolina, from Mead Paper Company in the 1970s. Jackson Paper remodeled the plant and radically changed the manufacturing process to produce fluted, corrugated material used in the manufacture of boxes. Jackson Paper started up its operations in 1982, one year after the test year 1981, and expected to reach a full production level of two hundred tons per day by early 1984. At full production, Jackson Paper will have a monthly non-coincident peak of 6,100 kW and a load factor of 85 to 90 percent. In addition, the evidence shows that Jackson Paper is the largest retail customer on Nantahala's system and that it is more than 50 percent larger and has a considerably higher load factor than Nantahala's next largest customer, Western Carolina University.

Nantahala's existing rate schedule for large industrial customers is its "Large General" ("LG") service schedule. The LG schedule as it existed prior to this case and as it was filed for the rates proposed in this case contained a demand limitation of 4,000 kw and stated: "Service for demands of 4,000 kw and over shall be under rate schedules to be filed with the North Carolina Utilities Commission."

At the hearing, three witnesses testified and presented exhibits on the subject of rate design: (1) Nantahala's witness, John K. Carson; (2) Jackson Paper's witness, Richard J. Rudden; and (3) the Public Staff's witness, Benjamin Turner. Nantahala's witness, Carson, sponsored the rate design ultimately adopted by the Commission. This schedule is a modification of Nantahala's old LG rate with the 4,000 kW demand limitation eliminated. Jackson Paper's witness, Rudden, recommended the establishment of a

new class of service for Nantahala, the LIS schedule, and offered a proposed rate design for that class.

In general, witness Rudden testified to differences in load characteristics between Jackson Paper and other large general service customers which might ordinarily justify a difference in rates charged to Jackson Paper to recover Nantahala's costs of service. Accordingly, Rudden recommended a new rate class for large industrial service customers, such as Jackson Paper, calculated on Nantahala's average or base costs rather than on the incremental costs Nantahala actually incurs in serving Jackson Paper. These "base" or "average" costs are the fixed costs of service separate from the costs of TVA purchased power. Rudden also recommended that Nantahala remove the current 4,000 kW limitation in the LG rate and make it available to all large general service customers. The proposed LIS class would be an option to those LG customers with demands exceeding 5,000 kW and whose load factors would make LIS more economical. At the time of the hearing, Jackson Paper was the only Nantahala customer which would qualify for the proposed LIS rate schedule.

In its discussion of the reasons why the proposed LIS rate would not be approved in this proceeding, the Commission stated that it "is unconvinced that the LIS rate schedule proposed for the Jackson Paper Manufacturing Company is cost justified . . . ." The evidence which apparently supports this conclusion is found in the immediately preceding discussion. After detailing the testimony by witness Rudden which would appear to support the LIS schedule solely from the perspective of load characteristics and average costs of service, the Commission stated:

> On cross-examination, Witness Rudden agreed that, while the LIS schedule would permit Nantahala to sell power at the rate of approximately 2.0 cents per kw[h], Nantahala must pay TVA 3.4 cents per kw[h] (based on a 100% load factor for purchased power) with the difference being made up by the other customer classes. In fact, Late-Filed Exhibit RJR-8 requested by Dr. Hammond shows that the overall increase in revenue requirement, after including the JPC load, will be $1,599,509; and only 56% of said $1,599,509 increase will be paid by Jackson Paper Company under the LIS rate

schedule, leaving a deficit which must be paid by the remaining rate classes.

Jackson Paper first challenges the Commission's determination by arguing that Rudden's testimony recommending the new rate class was uncontradicted and that there is no evidence supporting the Commission's conclusion that the proposed rate schedule should be rejected. However, even assuming, *arguendo*, that there had been no other evidence on the issue of rate design, the Commission may permissibly reject uncontradicted testimony. *Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786. Even where there is no direct evidence in the record contrary to the expert's opinion, a regulatory body may use its own judgment in evaluating evidence as to a matter within its expertise and is not bound by the uncontradicted recommendations of experts. *Id.* Therefore, the Commission was not required to accept Rudden's testimony even if there had been no contrary expert testimony on the question of rate design. Moreover, the Commission needed no additional evidence contradicting Jackson Paper's expert in rejecting its proposal.

In its order, the Commission stated that it was unconvinced that the LIS rate schedule proposed by Jackson Paper is cost justified. The Commission based this conclusion on the fact that the additional costs imposed by Jackson Paper would not be recovered through rates under the LIS schedule. This is so because Nantahala would be required to purchase the power it actually sold to Jackson Paper from TVA at 3.4 cents per kWh and could only sell that power to Jackson Paper for 2.0 cents per kWh under the LIS schedule.

Jackson Paper argues that the reasons recited by the Commission in rejecting the LIS rates are faulty because Nantahala's average cost of power from all sources is less than 1.0 cent per kWh and that the 2.0 cents per kWh mentioned by the Commission does not include the cost of power Nantahala recovers through the purchased power adjustment clause.

Jackson Paper's argument would appear to be logically correct but for the fact that it fails to take into account the *time* at which the Jackson Paper load was added onto the Nantahala system. As Nantahala points out in its brief, this factor is crucial because the load on Nantahala's system exceeded the capacity of

Nantahala's hydroelectric generating stations long before Jackson Paper became a customer. Therefore, based on the actual source of power to serve Jackson Paper, all of Jackson Paper's peak purchases come from power Nantahala purchases from TVA at 3.4 cents per kWh. The rate of 2.0 cents per kWh to which Jackson Paper refers includes all purchased power costs for the test year. There would be no additional revenues from the PPCA during the test year and in the future Nantahala will actually be purchasing additional power at 3.4 cents per kWh[4] solely because Jackson Paper's new load must be served, but would only be receiving 2.0 cents per kWh for the power sold to it under the proposed LIS rate. Therefore, the Commission's conclusion that the LIS rate schedule is not "cost justified" is supported by substantial evidence in the record taken as a whole and will not be disturbed on appeal. *Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786.

In addition, the Commission concluded that the LIS rate schedule would result in a revenue requirement deficit and that the remaining rate classes would be required to make up this deficit. Jackson Paper argues that this conclusion is irrelevant because leaving it on the LG rate schedule will also produce a deficit. Although it appears that the Commission has used a faulty example to illustrate its point, the principle remains sound: serving Jackson Paper on schedule LIS will unfairly increase rates to Nantahala's other customers in the long run, and the rates to these other customers will not increase as greatly if Jackson Paper is left on the LG schedule.

Jackson Paper makes a number of other arguments concerning the LG rate schedule established by the Commission in this case. However, all of these arguments are based upon cost of service calculations for Nantahala using *average* embedded costs; upon the proposed LIS schedule which is based on the *average* cost of providing power to Jackson Paper; and upon cost allocation factors which use *average* costs. The Commission, however, analyzed the LIS proposal on the basis of *incremental* costs to Nantahala to serve Jackson Paper. Whatever the abstract merit

---

4. We note that in view of the Administrative Law Judge's ruling on the Fontana III Agreements, the actual cost of purchased power may vary, but the principal involved would essentially remain the same.

of Jackson Paper's proposal may be, the company cannot escape the fact that it is the most recent large addition to Nantahala's already over-burdened system.

In fact, its witness, Rudden, admitted that Jackson Paper causes Nantahala to purchase additional power from TVA. Mr. Rudden further admitted that these additional energy requirements cause an increase in costs that will ultimately be spread over all of Nantahala's customers. This significant post-test year event and its implications cannot be viewed in isolation, and the Commission was properly concerned that the new rate schedule would not result in a fair and equitable recovery of the incremental costs imposed on Nantahala's system.

In order to accommodate the impact of Jackson Paper's load on the total Nantahala retail load, the Commission chose a compromise rate schedule which would permit Nantahala to receive approximately 2.3 cents per kWh for power sold to all customers on the LG schedule, including Jackson Paper. At this rate, Nantahala is unable to recover its entire incremental cost from Jackson Paper, but it is permitted to recover more of the actual cost of serving Jackson Paper than it would be under the proposed LIS rate. The rate established allows Nantahala to recover the average cost of serving all customers on the entire LG schedule. We conclude that the Commission properly exercised its discretion in refusing to single out one customer and set rates for that "class" based on the average costs of serving that isolated customer where the customer in question causes the utility to incur high incremental costs.

Although one of the goals of rate structure is the elimination of intra-class cross-subsidies, another goal is simplicity of rate structure. *Utilities Commission v. Edmisten*, 291 N.C. 424, 230 S.E. 2d 647 (1976). Obviously, it is impractical to have a separate class for each customer, despite the existence of some significant differences in load characteristics. Therefore, a balance must be struck. Based upon the record before us, we find no grounds upon which the Commission's choice between available options for rate design may be disturbed on appeal.

In its final argument, Jackson Paper maintains that the rate structure that results from the Commission's order is discriminatory in its failure to recognize the substantial differences in serv-

ice and conditions which exist between Jackson Paper and the other customers on the LG rate schedule. Jackson Paper cites *Utilities Commission v. Edmisten,* 291 N.C. 424, 230 S.E. 2d 647 (where substantial differences in services or conditions do exist, unreasonable application of the same rates may be discriminatory and thus improper), in support of its argument that the Commission's failure to establish the LIS rate for its service was unlawfully discriminatory. We do not agree.

Every rate schedule necessarily discriminates between customers within the class to which it applies to some extent. N.C.G.S. § 62-140, however, prohibits only *unreasonable* or *unjust* discrimination. *Utilities Comm. v. Oil Co.,* 302 N.C. 14, 273 S.E. 2d 232 (1981). The burden of proving that a rate is discriminatory lies with the complaining party. *Id.* Jackson Paper argues that its witness Rudden's testimony established the requisite differences in condition which would justify a separate rate for LIS customers. However, as we stated in our discussion of the evidence supporting the Commission's rejection of the LIS proposal, the Commission need not accept an expert's uncontradicted testimony, even where such testimony tends to show substantial differences in the conditions of service justifying a separate rate schedule for a particular customer or class of customers. It may yet, in the proper exercise of its own expertise and discretion and based on evidence indicating that LIS rate was not cost justified, refuse to establish a separate rate class for Jackson Paper without unreasonably or unlawfully discriminating against it.

Under the Commission's order, Jackson Paper was placed in the existing class of large general service customers. Modification was made in the design of this rate to allow for significantly larger customers, such as Jackson Paper. The Commission merely refused to treat Jackson Paper differently than Nantahala's other customers for the reasons stated above. Jackson Paper is, as a result, classified under the LG schedule along with Nantahala's other large purchasers of power. It, therefore, continues to benefit from Nantahala's hydroelectric generation because Nantahala's rates are set to recover the average cost to serve the average customer on that schedule. Jackson Paper is not treated differently than Nantahala's other large purchasers of power in light of all the relevant circumstances, and thus unreasonable discrimination does not result from the Commission's order. Ac-

cordingly, the portion of the Commission's order which deals solely with Jackson Paper's rates is affirmed.

## VII.

For the reasons stated, we reverse the portions of the Commission's final order of 12 April 1984 which address the issue of a roll-in rate making methodology in setting Nantahala's retail electric rates in Docket No. E-13, Sub 44, and approving the rate schedule filed by Nantahala on 13 December 1983. We affirm those portions of the order which concern the design of rates applicable to intervenor Jackson Paper Manufacturing Company. This case is remanded to the Commission for further proceedings in light of our decisions in *Nantahala I* and *Nantahala II*, and consistent with this opinion.

Affirmed in part.

Reversed in part and remanded.